**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

NORINE VANESSA SHELTON,

            Plaintiff,

v.                                       ACTION NO. 2:17cv609

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security,

            Defendant.

## <u>UNITED STATES MAGISTRATE JUDGE'S</u><br><u>REPORT AND RECOMMENDATION</u>

Plaintiff, Norine Vanessa Shelton ("plaintiff" or "Shelton"), brought this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act.

An order of reference dated February 21, 2018, assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that Shelton's second motion for summary judgment (ECF No. 30) be **DENIED**, that the Commissioner's second motion for summary judgment (ECF No. 32) be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.

## I.   PROCEDURAL BACKGROUND

Shelton protectively filed an application for supplemental security income on February 6, 2014. R. 10, 175–79.[1] Shelton alleges she became disabled on December 16, 2013, due to open heart surgery, a learning disability, high cholesterol, high blood pressure, pancreatitis, depression, and asthma. R. 222. The Commissioner denied Shelton's application on June 24, 2014, and, upon reconsideration, on October 30, 2014. R. 62–74, 76–88, 90–94. At Shelton's request, an Administrative Law Judge ("ALJ") heard the matter on August 25, 2016, and at the hearing received testimony from Shelton (who was represented by counsel), Shelton's mother, and an impartial vocational expert ("VE"). R. 33–61. On October 6, 2016, ALJ Stewart Goldstein denied Shelton's claims, finding that she had not been under a disability since February 6, 2014, the date her application was filed. R. 10–21.

On September 22, 2017, the Appeals Council denied Shelton's request for review of the ALJ's decision. R. 1–5. Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review. *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 416.1481.

Having exhausted all administrative remedies, Shelton filed a complaint with this Court on November 28, 2017. ECF No. 3. The Commissioner answered on February 16, 2018. ECF No. 8. In compliance with the Court's order, the parties filed cross motions for summary judgment addressing whether substantial evidence in the record supports the decision of the ALJ. ECF Nos. 11–12, 14–17.

---

[1] Page citations are to the administrative record previously filed by the Commissioner.

On September 25, 2018, plaintiff filed a motion for leave to amend the complaint, with a memorandum in support and a proposed amended complaint attached. ECF Nos. 18–19. In addition to the argument in count one that the decision of the ALJ is not supported by substantial evidence, Shelton alleges in count two of the first amended complaint that the defendant's decision to deny her SSI benefits "is unconstitutional and void because the agency's disability determination of this case violates the Appointments Clause and constitutional removal requirements." First Am. Compl. ¶ 10, ECF No. 25 at 2. This allegation is premised upon the holding in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), that ALJs for the Securities and Exchange Commission are "'Officers' under the Appointments Clause and cannot preside over hearings unless they are hired consistent with the Appointments Clause." Mem. in Suppt. Mot. For Leave to Am. 2–3, ECF No. 19. The Court granted Shelton leave to amend the complaint, and the amended complaint was filed on October 23, 2018. ECF Nos. 23, 25. Defendant answered the amended complaint on November 5, 2018. ECF No. 26. On the same day, Shelton and defendant withdrew the motions for summary judgment that addressed the original complaint. ECF Nos. 27, 28.

In compliance with the Court's second scheduling order, the parties filed cross motions for summary judgment addressing the amended complaint, which were fully briefed on January 22, 2019. ECF Nos. 30–34.[2] As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

---

[2] Plaintiff did not file a reply, and the time to do so expired on January 22, 2019.

## II.    RELEVANT FACTUAL BACKGROUND[3]

### A.    *Shelton's Background*

Norine Shelton was born in 1964 and was 49 years old on December 16, 2013, the onset date of her alleged disability.  R. 175.  Shelton completed the seventh grade, but ceased attending school at the age of 17, prior to completing the eighth grade.  R. 41, 53.

Shelton worked in housekeeping at several different hotels from 2008 through 2013.  R. 250.  Shelton generally worked five hours per day, six days per week on a seasonal basis.  R. 44–45, 190, 251.  Shelton stopped working in September 2013, when her seasonal position ended.  R. 222.  In December 2013, Shelton suffered a heart attack, which led to her application for disability benefits.  R. 222.

### B.    *Shelton's School Records*

An attendance audit report indicates that Shelton repeated the first and third grades, R. 1028, and this is consistent with the dates and grade levels listed in her school records.

Notes from Shelton's elementary transcript indicate that, in the first grade,[4] Shelton had some difficulty adjusting at first, but came "a long way" socially, was working hard, and was getting along with her classmates.  R. 281, 1034.  In second grade, her teacher noted that she was "very talkative and bossy," "love[d] attention," and was "not a fast worker but [] trie[d] very hard to do her best."  *Id.*  Her third-grade teacher noted that Shelton "had difficulty in class because she

---

[3] The only issue raised in this appeal is whether the ALJ erred in determining Shelton did not meet the criteria of listing 12.05 for a mental disability.  Accordingly, only those facts pertinent to Shelton's mental health are recited here.

[4] The transcript notes are not dated.  R. 281, 1034.  As a result, it is not clear whether the notes from Shelton's first and third grade teachers are from her first or second year in each grade.

4

did not follow directions well," but that "[w]hen she settled [down] to work she was able to do a pretty good job." *Id.*

Results of a "Metropolitan Readiness Test" administered when Shelton was seven years old,[5] and in her second year of first grade, indicate a percentile rank of 35 and a letter rating of C. R. 267, 272, 1019, 1024.

Shelton scored a 96 on a Kuhlmann-Anderson intelligence test administered in September 1972, when she was eight years old and in the second grade. R. 269, 1021. There is no indication of who administered the test. Shelton's birthday was again incorrectly listed as 1965, and her age incorrectly listed as seven years old. *Id.* When the same test was administered one year later, however, Shelton scored a 75. R. 271, 1023. That test was administered and scored by her third-grade teacher, who noted that Shelton "could not follow directions." *Id.* Her birthdate and age were again misstated. *Id.*

Testing of Shelton's reading ability was performed in February 1973 when Shelton was eight years old. R. 1020. Shelton scored a 77 out of 89 on her decoding skills and scored 80 out of 90 on comprehension skills. R. 268, 1020. Two months later, in April 1973, Shelton scored 71 out of 92 on decoding skills and 80 out of 90 on comprehension skills. *Id.*

A checklist grade sheet completed for the school years ending in 1973, and 1975–78, indicate whether Shelton was "progressing slowly," "progressing," or "progressing rapidly" in several core subjects, including reading, oral language, written language, mathematics, social

---

[5] As with many of her school records, this form indicates that Shelton was born in September 1965. R. 267, 1019. Accordingly, the form incorrectly states that Shelton was six-years old when the test was administered, one year younger than her actual age. *Id.*

studies, and science.  R. 276–77, 1029–30.  A separate sheet tracked her social development, including work habits, sociability, and personal growth for the same years. R. 279, 1032. Shelton was progressing slowly in every core subject during second grade, the 1972–73 school year, and her teacher only checked one out of 18 characteristics of social development evaluated, indicating that Shelton showed courtesy and consideration. R. 276–77, 279, 1029–30, 1032.

For the 1974–75 school year, Shelton's second year in third grade, Shelton was "progressing slowly" or "progressing" in the core subjects, and had checks for several areas of social development, including striving to complete work, working well independently, participating in group discussions, exercising leadership, and showing initiative. *Id.*

Shelton scored between the 2nd and 25th percentile for all subjects tested on an SRA assessment[6] conducted in October 1975, when Shelton was 11 years old and beginning the fourth grade.  R. 284, 1037.  The checklist completed the end of the 1975–76 school year indicated Shelton was "progressing" in almost all subject areas, "progressing rapidly" in social studies and science, and her teacher checked all 18 characteristics of social development with respect to work habits, sociability, and personal growth. R. 276–77, 279, 1029–30, 1032.

A standardized test conducted in 1977, when Shelton was in the fifth-grade, indicates a grade equivalent score of 2.2 in reading comprehension, a 4.4 in math comprehension, and a composite score of 3.4. R. 260, 1009. Her teacher indicated that she was "progressing" with respect to all core subjects, and checked all 18 characteristics evaluated with respect to work habits, sociability, and personal growth. R. 276–77, 279, 1029–30, 1032.

---

[6] A standardized test developed by Science Research Associates (SRA).

6

For the 1977–78 school year, when she was thirteen years old, Shelton was "progressing" with respect to most subject areas, and her teacher checked 10 of the 18 characteristics evaluated with respect to work habits, sociability, and personal growth. *Id.* Standardized testing during this sixth-grade year indicated a grade equivalent score of 4.6 in reading comprehension, a 4.9 in math comprehension, and a composite score of 4.3. R. 274, 1026.

During the 1978–79 school year, when Shelton was fourteen years old and in the seventh grade, she received 13 Ds and 11 Es over the course of the four quarters. R. 261, 1010.[7] Shelton was absent 68 days during the school year. R. 262, 1011. Shelton received 2.25 credits towards graduation for her passing grades, which are the only credits Shelton earned towards graduation. R. 261–62, 1010–11.

An SRA assessment survey conducted in October 1979, when Shelton was 15 years old and beginning the eighth grade, reflects that Shelton scored between the 1st and 20th percentile for all subjects tested. R. 282, 1035. Shelton was absent 101 days over the course of the school year, received all Es, and earned no credit towards graduation. R. 261–62, 1010–11.

Over the 1980–81 school year, when Shelton was 16 years old, she was absent 60 days, and earned all Es, with no credit earned towards graduation. *Id.*

A form completed by Shelton's guidance counselor in March 1982, when Shelton was 17 years old, reflects "Grade 9" and indicates that Shelton had 2.25 credits "earned to date," and that Shelton was not "presently in attendance." R. 286, 1040. Out of 12.75 credits attempted, Shelton only earned 2.25. R. 261–62, 1010–11.

---

[7] This report includes grades marked "Final," indicated all Es. R. 261, 1010. The name at the top of the chart providing these final grades is James Lawre Shelton. *Id.* It does not appear that these final grades are those earned by Shelton.

7

**C.**     *Statements by Shelton and Her Family Members*

On March 21, 2014, Shelton was interviewed at the Social Security field office in connection with her application for benefits. R. 218–20. The interviewer noted that Shelton was "unable to read and understand the questions asked during the interview," and "stated that her mom is the one who helps her all the time and she could not come" to the office that day. R. 219. Shelton indicated that she had stopped working on September 4, 2013, because her work was seasonal. R. 222. She further stated that, on December 16, 2013, her condition became severe enough to keep her from working. *Id.*

Shelton completed a function report form on April 9, 2014, with the help of her friend, Brian Pinner. R. 242–49. She indicated that she lived with her mother and family. R. 242. She reported going outside daily unless there is rain or snow and that she can go out alone, but that she does not drive. R. 245. Shelton stated that she can count change, but that she cannot pay bills, handle a savings account, or use a checkbook because she does not have a job. *Id.* She rated her ability to get along with authority figures and handle changes in routine as good, while her ability to handle stress was bad. R. 247. On a checklist, she indicated that her impairments affect her understanding, following instructions, memory, completing tasks, and concentration. R. 248. In a work history report completed the same day, Shelton stated she had previously worked in housekeeping or cleaning at several hotels from 2008 through 2013. R. 250. She generally worked five hours per day for six days per week. R. 251.

In disability reports dated July 9, 2014 and November 18, 2014, Shelton's attorney, John O. Goss, Esq., represented that there had been no change in Shelton's condition since the April 2014 report was completed. R. 291, 304.

### D.    *Shelton's Consultative Examination*

A psychological evaluation of Shelton was conducted by consultative examiner and clinical psychologist Karen M. Armstrong, Ph.D., on June 12, 2014. R. 742–45. Shelton was accompanied by her friend, Brian Pinner, who was not interviewed. R. 742. Both Shelton and her friend were driven to the evaluation and dropped off by Shelton's mother. *Id.*

Following a review of Shelton's school records, Dr. Armstrong noted the following: "academic skills were well below her grade placement level in elementary and subsequent grade levels"; "[m]ath skills consistently tracked higher than reading and written language"; "retained in grade once and placed in grade subsequently"; and, "one IQ score of 96." *Id.*

During her interview, Shelton reported that she had previously worked in housekeeping in several hotels, she was able to keep a job, and her best job was one that she maintained for five years. *Id.* Shelton indicated she stayed to herself and did not associate much with coworkers, responded appropriately to supervision, and did not have job conflicts. *Id.* Shelton reported feeling that others made fun of her, or took advantage of her, due to her learning problems. R. 742–43. Shelton reported that she could take the bus to get places, though she would need to ask someone when it was time to get off. R. 742. Shelton stated that she had last worked the previous year, and could not currently work due to her cardiac problems. *Id.*

Shelton reported a history of substance and alcohol abuse, but that she had attended a substance abuse treatment program, stayed in a halfway house for one year, had attended Alcoholics Anonymous and Narcotics Anonymous, and was currently in recovery through her church. *Id.* She took medication for anxiety, and reported suffering from panic attacks and depression. R. 742–43.

9

Shelton reported she had resided with her mother for the previous five years, and that she could care for her basic personal needs and perform basic household tasks. R. 742. Shelton related that her memory is "shot," she does not pay attention well, she has difficulty completing tasks, she is poor with financial management, and counts money on her fingers. *Id.* Her mother keeps up with her appointments, manages some of her money, and teaches her money management skills. *Id.* Shelton indicated that she is poor with reading and spelling, but better with math, and that she dropped out of school because they were attempting to put her into special education classes, which she did not want to attend. R. 743. She has two children, ages 32 or 33 and 27, and she has some contact with them. *Id.*

Dr. Armstrong found Shelton was appropriately attired and groomed, was oriented appropriately and knew personal information, used functionally receptive and expressive language when giving her history and during test instruction, had relevant speech content, and was concrete in thinking and problem solving. *Id.* She made good eye contact, had a passive demeanor, had appropriate social boundaries, and was cooperative. *Id.* Shelton's vocabulary, general knowledge, and arithmetic computation were below average, and she was easily flustered and had low confidence in her skills. *Id.*

Dr. Armstrong noted Shelton's short attention span, low persistence, and limited motivation, necessitating prompts to keep working during testing. *Id.* While Shelton could focus adequately and ultimately gave a good effort on all tasks, she required continual support and her work pace was slow. *Id.*

Shelton presented as "rather sad," with a dysphoric demeanor, and was anxious with many questions about the testing. *Id.* Shelton had limited insight and had a history of poor social

10

judgments, but had no specific limitations in self-preservation skills. *Id.* She understood conventional reasoning, and responded conventionally to comprehension questions such as why seatbelts are needed or what to do with a found wallet. *Id.* Shelton had logical and linear thought progression and no evidence of psychotic thinking. *Id.*

Dr. Armstrong administered the Wechsler Adult Intelligence Scale-IV, and Shelton obtained a full-scale score of 59, with a verbal comprehension score of 61, perceptual reading score of 75, working memory score of 58, processing speed score of 65, and a general ability index of 65. R. 744. The "functioning range" for each of these scores was "extremely low," with the exception of perceptual reasoning, which was "borderline." *Id.* Dr. Armstrong noted that the "[v]alidity of the test results was adequate," and she predicted with a 95 percent confidence level that Shelton would obtain a full-scale score of 56 to 65 on repeated assessments. *Id.* Dr. Armstrong indicated: "[i]t seemed likely that her cognitive skills are well below average, though not necessarily as low as her obtained score," and "[h]er working memory index seemed lower than her ability to recall personal data and her ability to perform informal memory tasks." *Id.* Dr. Armstrong indicated Shelton's "anxiety and her dysphoria seemed likely to interfere with cognitive efficiency," and she "does seem to have difficulty with coping." *Id.*

Dr. Armstrong concluded that Shelton "is provisionally diagnosed with an intellectual disability," although "[i]t is not clear that she was functioning at quite this low a level during the developmental period, as required by the diagnosis," and "her functional skills seemed better developed than her academic skills." *Id.* Dr. Armstrong noted that Shelton claimed to have had her current problems for many years, had "worked competitively" cleaning hotels despite them, and "seems to have adequate cognitive skills to continue to perform this type of simple and

11

repetitive work."   R. 744–45.   Dr. Armstrong commented that Shelton could take public transportation and perform other daily living tasks relatively independently, although reporting needing help with money management. R. 744. Dr. Armstrong found the limitations in Shelton's ability to work "do not seem to reflect her cognitive, affective, or adaptive skills," but rather elevated blood pressure and cardiac problems, although her chronic anxiety "probably interact[s] with her medical issues to lower her vocational efficiency." R. 745. Dr. Armstrong reported that Shelton had "moderate to significant limitations in her ability to perform competitive work on a consistent basis"; would not work well with the public due to her low vocabulary, low stress tolerance, and anxiety; and "would likely need social support and encouragement in a vocational setting." *Id.*

### E.   *State Agency Physician Review*

On June 19, 2014, Julie Jennings, Ph.D., reviewed the record and found Shelton was moderately limited in understanding and memory, noting Shelton's low IQ, but finding that her "overall functioning is higher than scores would indicate." R. 70, 72. Assigning great weight to Dr. Armstrong's opinion, Dr. Jennings explained that Shelton, "seems to have adequate cognitive skills to continue to perform simple and repetitive work. The limitations in her ability to work do not seem to reflect her cognitive, affective, or adaptive skills. She reported having had her current problems for many years and has been able to work despite them." R. 69. Dr. Jennings found that Shelton had a history of "functioning in the community, [and] working part time for a long period of employment," and that evidence in the record showed "she has been able to function at a higher level than current IQ scores would indicate." R. 71. Dr. Jennings indicated Shelton was moderately limited in her social interactions due to depression, anxiety, and a low IQ. *Id.* Dr.

Jennings concluded that Shelton "has significant work history and has worked competitively cleaning hotels." R. 72. Referencing Dr. Armstrong's notes, Dr. Jennings found Shelton has "adequate cognitive skills to continue to perform this type of simple and repetitive work." *Id.*

On June 24, 2014, James Darden, M.D., reviewed Shelton's record and noted that her "history of learning problems" "affect[s her] ability to perform some work activities," but that she "should be able to take care of personal needs, understand and follow simple directions, and perform simple, routine work." R. 74.

Jeanne Buyck, Ph.D., concurred with Dr. Jennings' opinion on October 29, 2014, and Jack Hutcheson, M.D., concurred with Dr. Darden's opinion on October 30, 2014. R. 84–88.

### F.    *Testimony before the ALJ*

#### *(Norine Vanessa Shelton)*

Shelton testified that she lived with her mother, brother, and her mother's husband. R. 40. She explained that she previously had a driver's license after passing an oral examination and was able to drive, but that she no longer had a license. R. 40–41. Shelton testified that she started having problems in school during seventh grade. R. 41. She completed the seventh grade and began, but did not complete, the eighth grade. *Id.* She was 17 years old when she stopped attending school. R. 53.

Shelton has difficulty reading and writing. R. 40–41. Shelton explained that she can read some words in a children's book, but cannot read the newspaper or a menu. R. 41. She can write, but has trouble with spelling. R. 42. While she can write and understand what she wrote, others would not be able to read what she wrote. *Id.*

Shelton testified that she last worked cleaning rooms at a hotel in 2013. R. 43–44. She

stated that it was a seasonal position at the oceanfront. R. 44. She performed similar work at three hotels prior to that, also on a seasonal basis. R. 45. Shelton indicated that, prior to working at the hotels, she worked at fast-food restaurants, but had difficulty working the register. *Id.* When questioned by her counsel regarding her frequent job changes, Shelton explained that employers "let [her] go" because she was too slow or could not "catch on." R. 52.

Shelton indicated that she became disabled in December 2013 after suffering a heart attack and undergoing surgery. R. 42. Shelton stated that she is prevented from working due to pain in her chest and left arm, her pancreas, shortness of breath, and anxiety. R. 47–49. Shelton testified that she stopped abusing cocaine in 2013, and had one relapse in 2014. R. 46–47. She also indicated that she suffered from shortness of breath, anxiety, asthma and bronchitis. R. 48, 53. Shelton testified that medication, such as albuterol and nitroglycerin, helped and did not cause any problems. R. 48–49, 53.

Shelton testified that she could cook Oodles of Noodles and fry chicken, but that her mother did most of the cooking. R. 50. Her mother drove her to the grocery store, helped pick out food, and paid with Shelton's SNAP card. R. 50–51. The only way Shelton could shop on her own is if her mother had taken her previously to show her the items she needed to buy. R. 41. Shelton stated that she attended church two times each month and got along with the people there. R. 51. She also visited with her family. *Id.* She had a cellphone, which her daughter showed her how to work. R. 52.

*(Barbara Williams)*

Shelton's mother, Barbara Williams, testified briefly and corroborated Shelton's testimony that she stopped using cocaine in 2013, except for one relapse in 2014. R. 54.

14

*(Vocational Expert – Paula Day)*

Paula Day, a vocational expert, was asked whether any work existed for a hypothetical person with Shelton's age, education, and work experience.  R. 55–57.  More specifically, Day was asked to opine about a person closely approaching advanced age with a limited seventh grade education and a limited ability to read and write, who was able to perform light work activity, with the following limitations:  (1) she could not perform a job that requires her to read or write; (2) she is limited to performing simple, routine tasks, and unskilled work that she would not have to perform at a production rate pace; (3) she would not have to interact with the public or coworkers on more than an occasional and superficial basis; and (4) where changes in routine, such as the addition of new or more complex tasks, would not occur more than once per month on average, and she would require extra supervision at those times.  *Id.*  Ms. Day testified that such a person could perform work as a motel housekeeper, mail order inserter, and cafeteria attendant, which jobs exist in significant numbers in the national economy.  R. 57.  Ms. Day then testified that such jobs would not exist for an individual who had the additional limitation that the person "is unable to function at 85 percent or more of the efficiency of an impaired worker."  *Id.*  Ms. Day further testified that no jobs would exist for someone who needed ongoing supervision to stay on task or complete a job.  R. 58–59.

## III.   THE ALJ's DECISION

To evaluate Shelton's claim of disability, the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled.  *See* 20 C.F.R. § 416.920(a).  Specifically, the ALJ considered whether Shelton:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals

15

a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment.  R. 11–21.

First, the ALJ found that Shelton had not engaged in substantial gainful activity since February 6, 2014, the date of her application for benefits.  R. 12.

At step two, the ALJ found that Shelton had the following severe impairments:  coronary artery disease, "status-post non-ST segment elevation myocardial infarction (NSTEMI)," hypertension, polysubstance abuse, pancreatitis, unspecified anxiety disorder, unspecified depressive disorder, borderline IQ, and asthma.  R. 12–13.  The ALJ classified any additional impairments, including congestive heart failure, gynecological impairments, finger swelling, and shoulder pain, as non-severe, because they responded to treatment or medication, required no significant medical treatment, had no more than a minimal effect on Shelton's ability to meet the basic demands of work activity, or did not continuously impose functional limitations upon her. *Id.*

Next, the ALJ determined that Shelton's severe impairments, either singly or in combination (along with her other conitions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three.  R. 13–15.

With respect to Shelton's mental impairment, the ALJ found Shelton did not meet listing 12.05, because the records do not indicate that her low IQ score was present before the age of twenty-two.  R. 14.  The ALJ found that Shelton was able to work in the past, could live alone,

and could perform personal care. *Id.* The ALJ stated that her school records showed a 2.25 grade point average,[8] and her assessments showed that she had rudimentary reading skills, could follow directions, and interact with her peers. *Id.* The ALJ noted that Shelton scored a 96 on her IQ test as a child, and that the state agency examiners found that her activities "suggest that she retained a higher IQ than the testing indicated." *Id.*

The ALJ next found that Shelton possessed the residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. § 416.967(b), subject to the limitations that she: (a) cannot perform a job that requires reading and writing, as she can "only perform basic reading and writing"; (b) can perform simple, routine tasks; (c) "is limited to performing unskilled work that does not require her to work at a production rate pace typically found on an assembly line or in piecework"; (d) "can have occasional and superficial social interaction with the public and coworkers"; and (e) can only have "[c]hanges in routine with the addition of new or more complex tasks" once per month on average "and she needs a few extra minutes of supervision at those times of change." R. 15.

In support of this RFC, the ALJ summarized Dr. Armstrong's findings made following the consultative exam. R. 17–18. The ALJ noted Shelton's difficulty with basic mathematics, slow work pace, short attention span, and sad demeanor, but also her adequate eye contact, pleasant and cooperative demeanor, and logical thought processes. *Id.* The ALJ listed each sub-score Shelton received on the WAIS-IV test, including the full-scale IQ of 59, and noted that the scores were classified as borderline to extremely low. R. 17. The ALJ noted Shelton's childhood IQ test score

---

[8] It appears the ALJ was referencing school records reporting that Shelton had earned a total of 2.25 credits towards graduation as of the Spring of 1982. R. 262, 286, 1011, 1040.

of 96. *Id.*

The ALJ accorded Dr. Armstrong's opinions significant weight. R. 19. The ALJ summarized Dr. Armstrong's opinion that Shelton: (1) had "functional skills [that] were better than her academic skills," (2) "worked competitively in the past," (3) "used public transportation," (4) "completed activities of daily living independently," and (5) "had adequate cognitive skills to perform simple and repetitive work such as cleaning hotels" with "limited interpersonal contact." R. 17–19.

The ALJ also assigned significant weight to the opinion of the state agency psychologist that Shelton had moderate limitations in performing activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. R. 19. The ALJ noted that the record reflected "very little treatment for any mental impairments." *Id.* The ALJ commented that Shelton was cooperative and pleasant during her examinations, able to interact with family and friends at church, able to recall dates during her hearing testimony, able to use public transportation, could express her needs, and could live alone. *Id.*

At step four, the ALJ determined that Shelton had no past relevant work. R. 20.

Finally, at step five, and after considering her age, education, work experience, and RFC, the ALJ found that Shelton could perform jobs, such as a motel housekeeper, mail order inserter, and cafeteria attendant, which existed in significant numbers in the national economy. R. 20–21. Accordingly, the ALJ concluded that Shelton had not been disabled since February 6, 2014, the date her application was filed. R. 21.

18

## IV.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to d etermining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ).'" *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid

of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Id.*

## V.     ANALYSIS

### A.     Shelton forfeited her constitutional challenge to the appointment of the ALJ.

Shelton's motion for summary judgment begins by challenging the ALJ's authority to adjudicate her claim. Relying upon the Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), Shelton contends that the ALJ, as an "inferior officer" subject to the Appointments Clause of the Constitution rather than merely an employee, was required to be appointed by the Commissioner of Social Security. Pl.'s Mem. in Supp. of Mot. for Summ. J. (Pl.'s Mem.) 6–9, ECF No. 31. Because ALJ Goldstein allegedly held no such appointment at the time he rejected Shelton's supplemental security income claim, First Am. Compl. ("Compl.") ¶ 10, ECF No. 25, Shelton argues the decision was void and remand is required. Pl.'s Mem. 9, 29.

Without addressing the ALJ's status as either an "inferior officer" or employee, the Commissioner argues that Shelton forfeited any Appointments Clause claim by failing to raise it during the administrative process. Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 7–8, ECF No. 33. This failure, the Commissioner contends, precludes Shelton's untimely assertion of such a claim in federal court. *Id.*

It is undisputed that Shelton failed to challenge the propriety of the ALJ's appointment before the SSA. *See* R. 37–38 (opening statement by attorney at ALJ hearing), 108–10 (requesting ALJ hearing and listing attorney representative), 173–74 (filing for Appeals Council review, signed by Shelton and attorney, asserting only that "[t]he ALJ's decision is not supported by substantial evidence"). After seeking judicial review, Shelton first raised the issue on September

25, 2018, when seeking leave to amend her complaint. ECF No. 18-1 at 2–3.

For the reasons more fully explained in this Court's report and recommendation filed in *Parker v. Berryhill*, No. 4:17cv143 (E.D. Va. Jan. 23, 2019),[9] Shelton forfeited her constitutional challenge to the allegedly defective appointment of ALJ Goldstein when she failed to raise the claim during the administrative process and no basis exists for excusing that forfeiture. The undersigned **RECOMMENDS** that summary judgment be **GRANTED** in the Commissioner's favor on count two of the amended complaint.

**B.    There is substantial evidence in the record to support the ALJ's finding that Shelton did not meet listing 12.05.**

Shelton asserts the ALJ's decision that she does not meet the criteria of listing 12.05 is unsupported by substantial evidence, and that deficits in adaptive functioning were apparent prior to Shelton reaching the age of 22. Pl's Mem. 3, 19–26. Defendant counters that substantial evidence supports the ALJs determination that Shelton's impairments did not satisfy the listing 12.05 criteria. Def.'s Mem. 17–25. Specifically, defendant asserts the ALJ properly weighed conflicting IQ scores, and plaintiff failed to meet her burden of proving deficits in adaptive functioning prior to age 22. *Id.*

**1.    Criteria for listing 12.05 – intellectual disability**

The Listing of Impairments describes those impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education,

---

[9] The plaintiff in *Parker v. Berryhill* is represented by the same counsel as Shelton, and Berryhill is represented by the same United States attorney. As a result, the same arguments are presented in both cases with respect to this constitutional challenge based on the Appointments Clause. *Compare* Pl.'s Mem. (ECF No. 31), Def.'s Mem. (ECF No. 33), with *Parker v. Berryhill*, No. 4:17cv143 (E.D. Va. Dec. 15, 2017), ECF Nos. 32, 37.

or work experience." 20 C.F.R. §§ 404.1525(a),  416.925(a); *see* 20 C.F.R. pt. 404, Subpt. P, App. 1 (listing impairments, organized by major body systems).  If a claimant's impairments meet or medically equal a listing, that alone suffices to establish disability at step three, without need for further analysis.  20 C.F.R. §§ 404.1520(d), 416.920(d).  An impairment meets a listing "when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." *Id.* at §§ 404.1525(c)(3), 416.925(c)(3).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

A claimant bears the burden of establishing impairments meeting or equaling the criteria of a listing. *See Zebley*, 493 U.S. at 530–31; *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (noting the claimant bears the burden of proof and production at steps one through four).  "[A]n ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).  Pursuant to *Cook*, however, the predicate to this duty is the existence of "ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments . . . ." *Ketcher v. Apfel*, 68 F. Supp. 2d 629, 645 (D. Md. 1999).  To permit meaningful judicial review to occur, the ALJ's ruling must discuss the evidence found credible and why, as well as apply the pertinent legal requirement to the evidence of record. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

At the third step of the sequential analysis, the ALJ addressed several listings pertaining to Shelton's physical impairments, as well as listing 12.05 covering intellectual disability. R. 13–15;

22

*See* 20 C.F.R. Pt. 404, Subpt. P, App. 1; 20 C.F.R. § 416.925.  Shelton argues for reversal of the

ALJ's decision solely based on the finding that Shelton did not meet the criteria for listing 12.05.

Pl.'s Mem. 19–26.

> Listing 12.05 provides:
>
> 12.05 Intellectual Disability: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
>> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>>
>> OR
>>
>> B. A valid verbal, performance, or full scale IQ of 59 or less;
>>
>> OR
>>
>> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>>
>> OR
>>
>> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in two of the following:
>>
>>> 1. Marked restriction of activities of daily living; or
>>>
>>> 2. Marked difficulties in maintaining social functioning; or
>>>
>>> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>>>
>>> 4. Repeated episodes of decompensation, each of extended duration.

23

DI 34132.011—Mental Listings from 09/29/16 to 01/16/17, available at https://secure.ssa.gov/poms.nsf/lnx/0434132011 (last visited January 24, 2019) (hereafter "20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 (2016)").[10] The introduction to the mental disorder listings explains that, to establish intellectual disability under listing 12.05, it is necessary to satisfy the diagnostic description contained in the introductory paragraph as well as one of the four sets of criteria contained in paragraphs A through D. *Id.*; *see also Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012) ("Listing 12.05 requires a showing of 'deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22,'" as well as one of the four requirements of A through D).

### 2.  Shelton meets subsection B of listing 12.05.

There seems to be no dispute that Shelton has met the requirement of subsection B, "[a] valid verbal, performance, or full-scale IQ of 59 or less." Dr. Armstrong administered the Wechsler Adult Intelligence Scale-IV to Shelton as part of her consultative examination, and Shelton obtained a full-scale score of 59, with a verbal comprehension score of 61, perceptual reasoning score of 75, working memory score of 58, processing speed score of 65, and a general ability index of 65.[11] R. 744. Dr. Armstrong noted that the "[v]alidity of the test results was adequate," and she predicted with a 95 percent confidence level that Shelton would obtain a full-

---

[10] Listing 12.05 was amended, effective January 17, 2017. The Court will apply the version in effect on October 6, 2016, the date of the ALJ's decision, which is DI 34132.011 governing mental listings from September 29, 2016 through January 16, 2017.

[11] The introduction to the mental disorder listings provides: "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full-scale IQs are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(c) (2016).

scale score of 56–65 on repeated assessments.  R. 744.

While arguing that the ALJ could weigh this score against others in the record, defendant does not argue that the score was invalid.  Def.'s Mem. 4, 19–22.

### 3.    Substantial evidence supports the ALJ's finding that Shelton failed to show deficits in adaptive functioning initially manifested before age 22.

The ALJ found that Shelton's mental impairments did not meet the criteria of listing 12.05 because the record does not "indicate that [Shelton] had an intellectual disability before age 22." R. 14. In other words, Shelton could not meet the criteria established in the introductory paragraph, "deficits in adaptive functioning initially manifested" "before age 22."  20 C.F.R. § 404 Subpart P, App. 1 § 12.05 (2016).

While the SSA has not adopted a "standard of measurement" for the term "deficits in adaptive functioning" used in the introduction of listing 12.05, *Strong v. Astrue*, No. 8:10cv00357-CMC, 2011 WL 2938084, at *8 (D.S.C. June 27, 2011) (citation and quotation marks omitted), the parties are in agreement that listing 12.05 was drafted pursuant to the definition of intellectual disability contained in the Diagnostic and Statistical Manual of Mental Disorders, which can offer some guidance for interpreting the listing.  Pl.'s Mem. 20; Def.'s Mem. 18.  The Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") provides that deficits in adaptive function "'limit functioning in one or more activities of daily living, such as communication, social participation and independent living,'" *Henry v. Colvin*, No. 3:13cv357, 2014 WL 856358, at *9 (E.D. Va. Mar. 4, 2014) (quoting DSM-V), which can include "'limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety.'"  *Henry*, 2014 WL 856358, at * 9 (quoting *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)).

The Fourth Circuit has addressed how a claimant can show deficits in adaptive function manifested before age 22. In *Turner v. Bowen*, the plaintiff quit school at age 16 and could not read or write, "having been socially promoted through the tenth grade." 856 F.2d 695, 696 (4th Cir. 1988). The first formal determination of Turner's IQ occurred in 1987 when WAIS testing during a consultative psychological evaluation showed Turner had a full-scale IQ of 67, a verbal IQ of 67, and a performance IQ of 68. *Id.* at 698. The Court relied on the holding in *Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir. 1985), that the absence of an IQ test "until later in life . . . does not preclude a finding of earlier retardation."[12] *Id.* at 698 (quotation marks omitted). The Court concluded:

> [t]he most important evidence, however, bearing on the application of § 12.05 is the testimonial and documentary evidence throughout the record establishing that Turner was unable to read or write at age sixteen even after ten grades of schooling—a clear "manifestation" of mental retardation occurring before age twenty-two.

*Id.* at 699. The Court reversed the district court's order and awarded benefits starting on the date of Turner's application. *Id.*

This holding was broadened by the Fourth Circuit's holding in *Luckey v. U.S. Dep't of Health & Human Servs.*, that "the evidence that [Luckey] could *barely* read or write was 'a clear manifestation' of mental retardation occurring before age twenty-two.'" 890 F.2d 666, 668–69 (4th Cir. 1989) (emphasis added) (quoting *Turner*, 856 F.2d at 699). Having completed only five grades, Luckey worked 60 to 80 hours per week from 1959 to 1982 in a country store, and stopped working in 1982 due to physical impairments that established a "a significant work-related

---

[12] The phrase "intellectual disability" replaced "mental retardation," which was used in previous versions of the listings. *Henry*, 2014 WL 856358, at *7 (citing DSM-V at 33).

limitation of function." *Id.* at 667, 669. On WAIS testing in 1986, Luckey had a full-scale IQ score of 68. *Id.* at 668. The Court noted that, "in the absence of any evidence of a change in a claimant's intelligence functioning, it must be assumed that the claimant's IQ had remained relatively constant." *Id.* The Court found the ALJ "may not rely upon previous work history to prove non-disability where the section 12.05(C) criteria are met." *Id.* at 669 (citing *Murphy v. Bowen*, 810 F.2d 433, 438 (4th Cir. 1987), which stated: "When a claimant for benefits satisfied the disability listings, benefits are due notwithstanding any prior efforts of the claimant to work despite the handicap."). Accordingly, the combination of Luckey's IQ score, his ability to "barely" read and write, and the lack of evidence that his IQ had changed, was sufficient to show the manifestation of intellectual disability before age 22. *Id.* at 669.

In 2000, listing 12.05 was amended to clarify that a claimant only meets the listing if the claimant's "'impairment satisfies the diagnostic description in the introductory paragraph'" to the listing, requiring deficits in adaptive functioning before age 22. *See Salmons v. Astrue*, No. 5:10cv195, 2012 WL 1884485, at *3 (W.D. N.C. May 23, 2012). As discussed in the following examples, courts consider multiple factors in determining whether plaintiffs satisfy this criteria, including: school performance, attending special education classes, school attendance, ability to work and the type of work performed, ability to read and write, performance of personal care, and performance of household chores.

In *Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012), the Fourth Circuit found the claimant had no deficits in adaptive functioning, in addition to finding no deficiency before age 22. The Fourth Circuit noted that either a finding of "no deficits in adaptive functioning generally," or "no deficiency manifest[ing] itself before the age of 22" would be sufficient to support a

conclusion that Hancock did not meet the criteria of listing 12.05. *Id.* at 475. Although Hancock's grades declined from fifth to eighth grade, records also show she was absent from school for approximately half of that time. *Id.* at 476. In addition, Hancock worked as a battery assembler and a drop clipper, jobs the vocational expert classified as semi-skilled. *Id.* The ALJ noted that Hancock

> has the ability to shop, pay bills, and make change; that she takes care of three small grandchildren at a level of care that satisfies the Department of Social Services; that she does the majority of her household's chores, including cooking and baking; that she is attending school to obtain a GED; and that she does puzzles for entertainment.

*Id.* Despite a full-scale IQ score of 63, the Fourth Circuit found the evidence sufficient to support a conclusion of no deficits in adaptive functioning, as well as supporting a finding that Hancock failed to prove a deficiency during her developmental years. *Id.*

In another case, a claimant did not establish sufficient deficits in adaptive functioning despite being held back in first grade, having poor grades, and obtaining a low IQ score when tested as an adult by the consultative examiner. *Mullins v. Astrue*, No. 1:09cv21, 2010 WL 917616, at *11 (W.D. Va. Mar. 11, 2010). Additional evidence regarding her adaptive function showed she could: perform personal care, cook meals daily, wash clothes, shop weekly, pay bills, count change, use a savings account and checkbook, enjoyed working crossword puzzles, attended church weekly, got along with others, reported no difficulty with memory, understanding, or following instructions, and was able to fill out the function report without assistance. *Id.*[13]

---

[13] The court gave the claimant the benefit of the doubt with respect to the argument that the Kuhlmann-Anderson Test does not constitute an IQ test, and discarded scores of 73 at age seven and 75 at age eight from consideration. *Mullins*, 2010 WL 917616, at *11. The same court had previously considered IQ scores on the Kuhlmann-Anderson Test. *See Brown v. Barnhart*, No. 1:06cv41, 2007 WL 120831, at *2, *6 (W.D. Va. Jan. 11, 2007).

Similarly, where a plaintiff completed ninth grade with passing grades, could read and write "a little bit," and was required to write and complete reports when working as a tow truck driver and pipe layer, he did not meet his burden of showing intellectual disability before age 22. *Henry*, 2014 WL 856358, at *10–11. Henry attended special education classes in fourth and fifth grade, earned Cs his eighth-grade year, and completed ninth grade earning all Ds. *Id.* at *1. Despite his verbal IQ score of 69 and full-scale score of 70, Henry held a commercial driver's license, and was able to perform the semi-skilled work of a tow truck driver for ten years, which he began before he was 22-years old. *Id.* at *11. The Court held that enrollment in some special education classes, failure to complete high school, and low IQ scores alone do not demonstrate deficits in adaptive functioning. *Id.* The Court further noted that past semiskilled work can provide substantial evidence for finding no deficits in adaptive functioning. *Id.* at *10 (citing *Hancock*, 667 F.3d 475–76).

This court found deficits in adaptive functioning manifesting before age 22, however, where the claimant left school at age 15 after completing the fifth grade, failed to perform satisfactorily in elementary school, obtained standardized test scores between the 1st and 23rd percentile, attended vocational school at the age of 15, could not read her mail, and implied she could not read or write anything but her name. *Williams v. Colvin*, No. 2:13cv703, 2014 WL 3828224, at *4, *13 (E.D. Va. Aug. 4, 2014). The court noted that Williams' school record did not include any IQ test scores. *Id.*

Here, the ALJ found Shelton failed to show deficits in adaptive functioning manifesting before age 22 for the following reasons: (1) she "was able to work in the past," (2) she "could live alone and perform personal care," (3) her "school records show that she had a 2.25 grade point

average, [] her assessments showed that she had rudimentary reading skills" and "she could follow directions and interact with her peers," and (4) "Dr. Armstrong noted that [she] had a 96 on her IQ test as a child" and the "state agency examiners also found that [her] activities suggest that she retained a higher IQ than the testing indicated." R. 14.

         **a.**      **The ALJ appropriately considered Shelton's work history.**

In support of the determination that Shelton did not meet the criteria of listing 12.05, the ALJ found that Shelton "was able to work in the past." *Id.* Shelton argues that she has "no past relevant work history of competitive employment," Pl.'s Mem. 22; explaining that she held 29 jobs in the 13 years prior to her heart attack in 2013, *id.* at 21 (citing R. 250–57).[14]

The record, however, contains evidence of Shelton's employment, and supports the ALJ's finding that she "was able to work in the past." R. 14. When applying for disability benefits, Shelton reported that she last worked in September 2013 because her seasonal job ended, and later testified that she remained out of work after suffering a heart attack. R. 42, 222. Shelton earned sufficient quarters of coverage to be covered by Title II's disability insurance benefits through March 2009. R. 188–90. In addition, Shelton reported to Dr. Armstrong that she held a single job for five years. R. 742.

Shelton's work history was only one factor listed by the ALJ for finding she did not meet listing 12.05. While an ALJ cannot solely rely on a claimant's work history "to prove non-disability where the section 12.05(C) criteria are met," *Luckey*, 890 F.2d at 669, work history can be considered in conjunction with other factors to determine if a claimant has deficits in adaptive

---

[14] The "Work History Report" completed by Shelton in April 2014, and cited in support of this assertion, only lists four employers with dates from 2008 through 2013. R. 250–57.

functioning. *See Hancock*, 667 F.3d at 476 (considering evidence of Hancock's previous work as a battery assembler and drop clipper when determining adaptive functioning); *Henry*, 2014 WL 856358, at *10 (holding "[t]he ALJ correctly considered Plaintiff's past work in finding that Plaintiff experienced no deficits in adaptive functioning"). Accordingly, it was appropriate for the ALJ to consider that Shelton "was able to work in the past" when determining whether she met listing 12.05, and this finding is supported by the record.

### b.   The ALJ appropriately considered Shelton's ability to function independently.

The ALJ's next reason for finding that Shelton failed to meet listing 12.05 was that she "could live alone and perform personal care." R. 14. Shelton does not dispute that she can perform personal care, but asserts the record contains "no evidence that she is able to function independently." R. 14; Pl.'s Mem. 25. Shelton points out her report to Dr. Armstrong that she lived with her mother, her mother keeps up with her appointments because she is unable to do so, her mother manages some of her money and tries to teach her money management, and that her male friend and her social worker read things to her. Pl.'s Mem. 22 (citing R. 743). Shelton next referenced her hearing testimony that she relies on her mother or others for transportation to shop or attend church, she can only shop at a grocery store if her mother has taken her previously to show her what to buy," and she can cook Oodles of Noodles and fry chicken, but her mother usually cooks, takes her to the grocery store, and pays with her SNAP card. *Id.* 22–23 (citing R. 41–42, 50–51).

Dr. Armstrong reviewed Shelton's function reports and school record, and conducted an interview of Shelton. R. 742–43. Dr. Armstrong noted that Shelton reported she had resided with her mother for the previous five years, and that she could care for her basic personal needs and

31

perform basic household tasks. R. 743. Shelton reported that she had previously worked in several hotels, was able to keep a job, had maintained work with one employer for five years, and was not currently able to work due to her physical impairments. R. 742. Dr. Armstrong found that Shelton could "take public transportation, and perform various other daily living tasks relatively independently," although needing "help with money management." R. 744. Dr. Armstrong further found that Shelton's "functional skills seemed better developed than her academic skills," and that she had "adequate cognitive skills" to perform "simple repetitive work." R. 744–45. The ALJ relied on Dr. Armstrong's evaluation, finding Shelton "was able to engage in high functioning tasks such as work, taking care of herself and using public transportation." R. 18. There is sufficient evidence in the record to support the ALJ's finding that Shelton could function independently.

### c.   The ALJ appropriately considered Shelton's school records when determining her adaptive deficits before age 22.

The ALJ found Shelton's "school records show that she had a 2.25 grade point average, [] her assessments showed that she had rudimentary reading skills," and "she could follow directions and interact with her peers." R. 14. Shelton correctly asserts that the ALJ misread the record in determining that she had a 2.25 grade point average. Pl.'s Mem. 23; R. 14. The only grades in Shelton's school record are for the school years 1978–79 (when Shelton was absent for 68 days), 1979–80 (when Shelton was absent for 101 days), and 1980–81 (when Shelton was absent for 60 days). R. 286, 1010–11. Of the 51 grades reported, Shelton received Es in all but 9. *Id.* Shelton earned .25 credit for each of those passing grades, resulting in 2.25 total credits earned over those three years. *Id.* The Court agrees that the ALJ's finding that Shelton had a 2.25 grade point average is a misreading of a record indicating she had earned 2.25 credits towards graduation. R.

14, 286, 1010–11. The Court further notes that, like Hancock, Shelton's failing grades coincided with her excessive absences. *See Hancock*, 667 F.3d at 476; R. 261–62, 1010–11 (report of Shelton's grades and absences).

The record supports the ALJ's finding that Shelton had rudimentary reading skills. Reading tests conducted when Shelton was eight years old reflected a 77 out of 89 and 71 out of 92 in decoding skills and an 80 out of 90 in comprehension skills. R. 268, 1020. Shelton was reading at the fourth-grade level when she was in the sixth-grade. R. 274, 1026.

Shelton does not challenge the finding that she can follow directions and interact with her peers, and there is support in the record for the ALJ's findings. R. 14. Shelton's school records included two notations from her third-grade teacher that Shelton could not follow directions, R. 271, 281, 1023, 1034, but her teachers noted positive work habits, sociability, and personal growth from fourth through sixth grade, including specifically indicating that Shelton "follows directions." R. 279, 1032. Dr. Darden, a state agency reviewer, noted Shelton's ability to "understand and follow simple directions." R. 74.

The error by the ALJ in interpreting Shelton's credits earned towards graduation as her grade point average is not sufficient to require remand, when there is sufficient additional support in the record for the ALJ's decision.

> **d.    The ALJ appropriately weighed the IQ scores, while considering evidence of adaptive functioning.**

As further support for his finding that Shelton failed to show intellectual disability before age 22, the ALJ relies upon Dr. Armstrong's evaluation, which "noted that [Shelton] had a 96 on her IQ test as a child." R. 14.

33

Shelton argues there are several problems with the ALJ relying on the 96 IQ test score. Pl.'s Mem. 24–26.   First, Shelton references a requirement in the listing that the test be administered by a qualified specialist. Pl.'s Mem. 24.  Listing 12.00(D)(5)(a) provides:

> Reference to a "standardized psychological test" indicates the use of a psychological test measure that has appropriate validity, reliability, and norms, and is individually administered by a qualified specialist. By "qualified," we mean the specialist must be currently licensed or certified in the State to administer, score, and interpret psychological tests and have the training and experience to perform the test.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05 (2016).[15] Shelton points out that the one-page summary report is unsigned, and there are no supporting documents to indicate the test was properly administered or under what conditions the testing occurred. Pl.'s Mem. 24 (citing R. 269).

Secondly, Shelton relies on her score of 75 on the same test one year later, and argues her contemporaneous school records do not support a finding that Shelton was performing at the exact middle range of intellectual functioning (that is, a fifth-grader reading at a fifth-grade level) as indicated by the score of 96. Pl.'s Mem. 24–25.

While these are valid concerns to be considered, it is within the ALJ's discretion to weigh these factors, and the Fourth Circuit affords the ALJ great discretion when assessing the validity of an IQ test result. *Hancock*, 667 F.3d at 474.  As part of this discretion, the ALJ is not required

---

[15] Shelton quotes current listing 12.00(H)(2)(b), which provides that the SSA "will find standardized intelligence test results usable for the purposes of 12.05B1 when the measure employed meets contemporary psychometric standards for validity, reliability, normative data, and scope of measurement; and a qualified specialist has individually administered the test according to all pre-requisite testing conditions." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.  The version in effect at the time of the ALJ's decision is slightly different, as noted above.

to accept an IQ test result, even when it is the only test in the record, when sufficient circumstances exist to discredit the score. *Id.* For example, Hancock underwent intelligence testing with a consultative examiner who reported a verbal IQ of 66, performance IQ of 67, and a full-scale IQ of 63. *Id.* at 473. In the narrative report, the examiner did not comment on the validity of the test or state whether Hancock gave her best effort. *Id.* Although this was the only IQ score in the record, the ALJ found it was inconsistent with Hancock's actual adaptive functioning and with her treating psychiatrist's notes. *Id.* at 474. The Fourth Circuit held that the examiner's failure to attest to the validity of the score, along with the inconsistency between the results and the other evidence in the record, was sufficient support for the ALJ's rejection of the only record IQ test score. *Id.* at 475.

With respect to Shelton's 96 IQ test score, several factors detract from the weight of the score Shelton received when she was eight years old and in the second grade. Although not noted by Shelton, the one-page sheet incorrectly lists her birthdate as 1965 and her age as seven. R. 269, 1021. The form is not signed and there is no indication as to who administered the test, though her teacher's name is provided at the top of the form. There are no supportive documents attached, and no narrative provided. Moreover, the following year, she received a score of 75 on the same test, which was administered by her third-grade teacher, who noted that Shelton "could not follow direction." R. 271, 1023. Neither the ALJ, nor Dr. Armstrong, references this additional test score. *See* R. 744. The second score, however, while showing a marked decline over one year, does not fall within the range of intellectual disability for listing 12.05. As such, it lends slight support to the ultimate finding that Shelton's intellectual disability did not manifest before age 22.

In this instance, the ALJ relied upon the consultative examiner, Dr. Armstrong, when referencing the score of 96 that Shelton received on her childhood IQ test. R. 14. Dr. Armstrong's opinion, after interviewing and testing Shelton, was that Shelton was "provisionally diagnosed with an intellectual disability," but "[i]t is not clear that she was functioning at quite this low a level during the developmental period, as required by the diagnosis. Also, her functional skills seemed better developed than her academic skills." R. 744. Dr. Armstrong, a mental health expert, reached this conclusion after reviewing Shelton's school records and function reports, interviewing Shelton, and performing mental health testing. Moreover, "[g]rades and IQ scores, without more, do not prove how effectively individuals cope with common life demands and how well they meet the expected standards of personal independence." *Moon v Astrue*, No. 6:08cv40016, 2009 WL 430434, at *7 (W.D. Va. Feb. 20, 2009) (citing DSM-IV at 42). After considering all of the evidence, Dr. Armstrong concluded that Shelton was capable of performing certain kinds of simple repetitive work. R. 745. The ALJ appropriately relied on the conclusions of Dr. Armstrong, the mental health expert, when weighing Shelton's IQ scores and determining whether she showed deficits in adaptive functioning manifesting before age 22.

### e.    The ALJ appropriately relied upon the findings of the state agency doctors.

In reaching his conclusion that Shelton did not meet listing 12.05, the ALJ further relied upon the finding of the state agency doctors, who "also found that the claimant's activities suggest that she retained a higher IQ than the testing indicated." R. 14. Dr. Jennings reviewed Shelton's record and found that her "overall functioning is higher than scores would indicate," and that she had "adequate cognitive skills to continue to perform . . . simple and repetitive work." R. 70, 72. Similarly, Dr. Darden, another state agency reviewer, noted Shelton's "history of learning

problems" "affects [her] ability to perform some work activities," but that she "should be able to take care of personal needs, understand and follow simple directions, and perform simple, routine work." R. 74.

Where the record contains conflicting evidence, the ALJ has the discretion to weigh the conflicting evidence, while relying on the experts' opinions. It was appropriate for the ALJ to rely on the opinions of the state agency examiners in weighing the conflicting evidence in the record regarding Shelton's deficits in adaptive function before age 22.

      **f.**     ***Luckey* does not direct a finding that Shelton meets listing 12.05.**

Lastly, Shelton argues that the ALJ's citation to the record has not overcome the presumption established in *Luckey*, 890 F.2d at 668. Shelton quotes the following finding in *Luckey*:

> This court has recognized that the Secretary's regulation "expressly define[s] mental retardation as denoting 'a lifelong condition.'" *Branham v. Heckler,* 775 F.2d 1271, 1274 (4th Cir.1985). However, the court noted that there are many possible reasons why an adult would not have obtained an IQ test early in life and the absence of an IQ test during the developmental years does not preclude a finding of mental retardation predating age 22. *Id.* The court held that *in the absence of any evidence of a change in a claimant's intelligence functioning*, it must be assumed that the claimant's IQ had remained relatively constant. *Id.*

*Id.*

Unlike Luckey, Shelton's record contains two IQ test scores of 96 and 75 from tests administered to Shelton when she was eight and nine years old, as well as evidence of adaptive functioning as an adult. Although there are many factors that weigh against giving her childhood test scores excessive weight, they do provide some insight into Shelton's mental abilities as a child.

The ALJ properly weighed the evidence, including the test scores Shelton received as an adult and a child, in determining Shelton failed to show deficits in adaptive functioning before age

22. *See Justice v. Barnhart*, 431 F. Supp. 2d 617, 620 (W.D. Va. 2006) (finding "IQ alone, however, does not establish that [the claimant] manifested deficits in adaptive functioning before age 22 because the Commissioner could arguably rebut that assertion or her claim of mental impairment itself"). The consultative examiner and the state agency examiner also considered the scores in arriving at their opinions regarding Shelton's impairment. Both experts' opinions provide support for the ALJ's decision that Shelton did not show deficits in adaptive functioning before age 22.

It is the ALJ's responsibility to weigh the evidence and resolve any conflicts. *Hays*, 907 F.2d at 1456. This Court cannot reweigh the evidence, and can only assess whether the Commissioner has applied the appropriate legal standards and whether findings of fact are supported by substantial evidence. *Id.* In this case, the appropriate legal standard was applied, and substantial evidence supports the ALJ's finding that Shelton does not meet the criteria of listing 12.05.

## VI.   **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's second motion for summary judgment (ECF No. 30) be **DENIED** as to counts one and two, defendant's second motion for summary judgment (ECF No. 32) be **GRANTED** as to counts one and two, and the decision of the Commissioner be **AFFIRMED**.

## VII.   **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that, pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections

to the foregoing report and recommendation within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three (3) days permitted by Rule 6(d) of said rules.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, plus three days permitted by Rule 6(d) of said rules).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the report and recommendation will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/

Robert J. Krask
United States Magistrate Judge
Robert J. Krask
United States Magistrate Judge

Norfolk, Virginia
January 24, 2019